U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

**JAN 2 6 2007**

CLERK, U.S. DISTRICT COURT
By _____
            Deputy



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY<br>FUTURES TRADING COMMISSION,<br><br>    Plaintiff,<br><br>V.<br><br>PREMIUM INCOME CORPORATION,<br>et al.,<br><br>    Defendants. | § § § § § § § § § § § |

CIVIL ACTION NO. 3: 05-CV-0416-B

### ORDER

## I.

### INTRODUCTION

This matter came before this Court on the supplemental application by plaintiff U.S.

Commodity Futures Trading Commission ("CFTC") in support of the entry of final judgment for

permanent injunction against defendants Premium Income Corp. ("PIC"), Inforex, Ltd.,

("Inforex"), and Tri-Forex International, Ltd. a/k/a Tri-Forex, Ltd. ("Tri-Forex") (collectively

"Corporate Defendants") for violations of the antifraud and contract market provisions of the

Commodity Exchange Act, as amended ("Act"), Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and

CFTC Regulations 1.1(b) and 32.9, 17 C.F.R. §§ 1.1(b), 32.9.  The application also requests that

the Court enter judgment setting the amounts for restitution, disgorgement, and civil monetary

penalties, and order other ancillary equitable relief.

This Court, being fully advised in the premises, grants plaintiff's supplemental

- 1 -

application and directs the entry of findings of fact, conclusions of law, orders of permanent

injunction, restitution, disgorgement, civil monetary penalties, and other equitable relief pursuant

to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

## II.

### JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. §

13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is

engaging, or is about to engage in any act or practice constituting a violation of any provision of

the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action

against such person to enjoin such practice or to enforce compliance with the Act.

The CFTC has jurisdiction over the option transactions in foreign currency alleged herein.

Pursuant to Sections 2(c)(2)(B) of the Act and 4c(b), 7 U.S.C. §§ 2(c)(2)(B) and 6c(b), the CFTC

has jurisdiction over an agreement, contract or transaction in foreign currency that is an option on

foreign currency and that is offered to, or entered into with a person that is not an eligible

contract participant unless the counterparty is one of the six regulated entities designated under

Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2.  Defendants offered options on foreign currency to

persons that were not eligible contract participants.  Defendants acted as purported counterparties

to the offered foreign currency transactions.  None of the defendants was a proper counterparty

who could offer and/or enter into foreign currency option transactions with persons who are not

eligible contract participants, i.e., retail customers.

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-

1(e), because defendants transacted business in the Northern District of Texas, and the acts and

practices in violation of the Act and the CFTC Regulations occurred within this District, among other places.

## III.

## FINDINGS OF FACT

**A.     The Parties**

Plaintiff **U.S. Commodity Futures Trading Commission** ("CFTC") is the independent federal regulatory agency charged with the administration and enforcement of the Act, 7 U.S.C. § 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. § 1.1 *et seq.*

Defendant **Premium Income Corporation** ("PIC") is a corporation that was registered in the State of Wyoming on January 20, 2004.  From January 2004 to March 2005 ("relevant time"), defendant Gerald Leo Rogers ("Rogers") controlled the activities of PIC and represented that he was the owner and President of PIC.  Rogers had ultimate control over PIC's bank accounts, finances, trading transactions, and statements to the public.  During the relevant time, PIC maintained an office at 2470 Westlake Avenue North, Suite 104, Seattle, WA 98109.  PIC corporate documents list Inforex, Ltd., a corporation controlled by Rogers, as its principal.  PIC also represented that it is a wholly owned subsidiary and the USA division of Tri-Forex International, Ltd.  During the relevant period, PIC solicited and accepted funds from the retail public and represented that it used those funds to write long term covered call options on foreign currency through its international network of currency exchange brokers ("PIC Program").  PIC has never been registered with the CFTC in any capacity.

Defendant **Inforex, Ltd.** ("Inforex") is a corporation that was formed under the laws of the State of Nevada on December 2, 2002.  During the relevant time, Rogers controlled the

activities of Inforex and had ultimate control over Inforex's bank accounts, finances, trading

activities, and statements to the public. In its corporate filing, Inforex lists its business as

currency trading and represents that it maintained an office at 4300 North Miller Road,

Scottsdale, AZ in 2003. In May 2004, Inforex registered to do business in the State of

Washington at 2470 Westlake Avenue North, Suite 104, Seattle, Washington 98109, which was

the same address as PIC. Inforex has never been registered with the CFTC in any capacity.

Defendant **Tri-Forex International, Ltd.** also known as Tri-Forex Ltd. and International

Forex Company ("Tri-Forex") represents that it is a company located in London, England, with

offices in Sydney, Tokyo, and Seattle. Tri-Forex lists its business address in Seattle, Washington

as 2470 Westlake Avenue North, Suite 104, Seattle, Washington 98109, which is the same

business address as the address of PIC. Tri-Forex claims to be "the world's leading company for

the funding of Currency Tax Strategies in the United States." Contrary to these representations,

the governments of the United Kingdom, Australia, and the State of Washington have no records

showing that Tri-Forex has registered to do business in their jurisdictions. Tri-Forex has never

been registered with the CFTC in any capacity.

**B.      PIC, Inforex, and Tri-Forex are in Default**

The CFTC filed its Complaint in this proceeding on March 2, 2005. PIC was served with

the Complaint and this Court's Summons on March 3, 2005. Inforex and Tri-Forex were served

with the Complaint and this Court's Summons on March 4, 2005. Copies of the process server's

affidavits were filed with the Court on March 9, 2005.

PIC, Inforex and Tri-Forex have not filed an answer to the Complaint and they have not

otherwise appeared before this Court to defend in this cause.

PIC, Inforex and Tri-Forex are neither infants nor incompetent persons, and are not eligible for relief under the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. Appendix, § 501 *et seq*.

No appearance has been entered by counsel on behalf of these corporate defendants. These entities may not proceed *pro se* in this litigation. *See Donovan v. Road Ranges Country Junction, Inc.*, 736 F.2d 1004, 1005 (5th Cir. 1984); *Southwest Express Co. v. Interstate Commerce Comm'n*, 670 F.2d 53, 55 (5th Cir. 1982).

On September 9, 2005, the Court, pursuant to Fed. R. Civ. P. 55(b), entered an Order Granting Interlocutory Judgment by Default and Granting Injunctive and Other Equitable Relief against the Corporate Defendants. ("Interlocutory Judgment"). [Docket #86]. The Interlocutory Judgment permanently enjoined the Corporate Defendants from further violations of the anti-fraud and contract market commodity option provision of the Act, 7 U.S.C. § 6c(b), and the CFTC Regulations 1.1(b) and 32.9, 17 C.F.R. §§ 1.1(b), 32.9, delineated in the CFTC's Complaint. The Interlocutory Judgment further states that the CFTC is entitled to restitution, disgorgement, and civil monetary penalties against the Corporate Defendants.

## C. Summary of the Fraudulent Scheme

From at least January 2004 to the March 2005, the Corporate Defendants engaged in a fraudulent scheme to solicit members of the public throughout the United States to send millions of dollars for the purpose of engaging in illegal foreign currency option transactions.

The Corporate Defendants solicited customers to send them funds by representing that customer funds would be used to engage in foreign currency covered call transactions, and that customers would be guaranteed a profitable annual return on their funds of between 10% and

14.2% with no risk of loss to their principal. The Corporate Defendants represented that they made their "fixed income strategy of the decade" available exclusively in the United States under a special license agreement with a bank located in Switzerland.

Contrary to the Corporate Defendants' representations to customers, customer funds were not invested as promised and there is no guarantee of fixed profits in foreign currency covered call transactions. Further, the risk of loss may be substantial in connection with foreign currency covered call transactions.

By falsely representing to customers that foreign currency covered call transactions produce guaranteed profits with no risk of loss to principal, the Corporate Defendants fraudulently solicited individuals to send funds to accounts under their control at various domestic and offshore banks and misappropriated customer funds.

The Corporate Defendants represented that customer funds would be deposited into individual PIC accounts and used exclusively for foreign currency option transactions. Although customer funds were initially deposited in bank accounts in the name of PIC, the Corporate Defendants did not disclose to customers that their funds were immediately transferred from the PIC bank accounts to a domestic bank account in the name of Inforex and then transferred to offshore bank accounts in the name of Inforex. The Corporate Defendants made monthly payments to some customers from the domestic Inforex bank account, and represented that those funds were derived from foreign currency option transactions taking place offshore. However, the Inforex domestic account that the Corporate Defendants used to make monthly payments to customers contained no funds that were deposited either from offshore bank accounts or from trading accounts representing putative trading profits for customers.

The Corporate Defendants represented that they engaged in foreign currency option transactions through an agreement they had with a Swiss bank called Union Bank Inter.net. In fact, Union Bank Inter.net is not physically located in Switzerland and is not registered with the Swiss Federal Banking Commission, as required by Swiss law. Its website is registered to a business located in Scottsdale, Arizona, and is paid for by credit cards in the name of defendant Gerald Rogers and Inforex.

The Corporate Defendants represented that customer funds would be entirely used to conduct covered call option transactions and would not be used for any other purpose. Contrary to that claim, customer funds were routinely transferred to domestic accounts under the control of Rogers. At least a portion of those funds were used for purposes unrelated to foreign currency options trading, including the payment of personal expenses and the undisclosed payment of commissions to individuals who solicited customers on behalf of the Corporate Defendants.

**D.      The Corporate Defendants Committed Widespread Fraud
In Connection With Foreign Currency Option Transactions**

From at least 2004 and continuing through the present, the Corporate Defendants, either directly or through other persons or entities under their employ, supervision and control, or acting in combination or concert with them, or by participating or materially aiding in the offers and sales of commodity options, participated in a fraudulent scheme to solicit retail customers throughout the United States and elsewhere to send funds to them for the purpose of engaging in foreign currency covered call option transactions traded in the foreign exchange markets ("forex"). The Corporate Defendants fraudulently obtained funds from customers by making misrepresentations and omissions of material fact about profit, risk of loss, and their experience

in connection with trading options on foreign currency.

### i.    Covered Call Writing

A "call" is one of two types of commodity options, and conveys to the buyer the right (but not the obligation) to purchase a specific commodity or other asset at a particular price during a specified period of time.  The price for which the commodity can be bought (in the case of a call) under the terms of the option contract is referred to as the option's strike price or exercise price.  The date on which an option expires--the date after which it can no longer be exercised--is the option's "expiration date."  "European style" options – the type involved in the covered call transactions offered by PIC – can only be exercised on the expiration date.  The price of an option itself, *i.e.*, the sum of money or other consideration paid by the buyer of an option and received by the seller of an option, is the option's "premium."

The option seller's or writer's potential for profits are limited to the amount of the premium received for sale of the option.  The potential for losses, however, is virtually unlimited.  For example, the seller or writer of a call option on a given commodity will realize a profit in the amount of the premium received if the commodity price never rises above the strike price of the option, since the option will expire unexercised.  To the extent that the commodity price rises above the strike price by an amount that more than offsets the original premium income, and continues to rise as expiration of the option approaches, however, the call option seller stands to lose ever-increasing amounts.

Covered calls are call options sold, or written, against an asset that one owns (called "cover").  If the covered call is ever exercised by the holder of the option, the writer of the option can satisfy the exercise by delivering the cover.  In essence, the covered call writer exchanges the

opportunity to participate in potential increases in the value of the asset that he uses for cover for the option premium that is received from the sale of the call option. The Corporate Defendants purported to write call options valued against a foreign currency rate and covered by an asset consisting of U.S. dollars.

The risk retained by the covered call writer is that the value of the asset that provides cover may decrease in value by more than the amount of the premium received from writing the option. In the extreme, the covered call writer could lose the entire value of the cover and be left with only the premium.

### ii.    Scope Of The Fraudulent Scheme

The Corporate Defendants solicited customers to open accounts with PIC for the purpose of engaging in foreign currency covered call transactions. Calling their scheme the "Fixed Income Strategy of the decade" the Corporate Defendants aggressively marketed their fraudulent scheme to the public through public seminars, direct mailings, public advertisements, and the Internet websites www.premiumincomecorp.com ("PIC Website"), www.premiumincomebrokers.com ("PIB Website"), and www.unionbankinter.net (UBI Website").

The Corporate Defendants especially targeted retired persons to send funds to PIC. The Corporate Defendants represented that speculation in stocks could be a recipe for disaster for persons who are retired or approaching retirement age, and that PIC's "guaranteed locked-in profits" represented the solution to their fixed-income dilemma. The Corporate Defendants further represented that PIC's purported locked-in profits "will almost always out-perform Government bonds, bank CDs and money market accounts."

The scheme the Corporate Defendants promoted was as follows:  PIC offered an investment at its seminars, and through its brochure and web-site, entitled "Writing Covered Calls on Currency Deposits," through which PIC represented that it sold covered currency calls on the investor's behalf to a speculator.  Under the covered call, an investor deposited currency (U.S. dollars) with PIC, and was paid up front premiums by a speculator who received a call option granting him the right, but not the obligation, to buy the investor's currency deposit in exchange for Euros at the prevailing exchange rate at either a 5 year or 10 year expiration date. The currency calls purportedly were written with European option terms, which differ from American terms, in that the European call cannot be exercised until the expiration date.  The solicitation material claimed that in writing covered calls on behalf of its customer, PIC would "never place your deposit(s) at risk."  To give the customer the appearance of safety, PIC's brochure emphasized that the customer was not the "speculator" in this transaction.

The Corporate Defendants perpetuated their fraudulent scheme by actively recruiting financial planners, insurance agents, and other persons throughout the United States to become PIC brokers.  The Corporate Defendants entered into written broker agreements with such persons, designating them as new "Area Brokers" for PIC.  The agreements provided that PIC would pay an Area Broker 10% of the gross funds deposited by a customer with PIC to purchase 5 or 10 year foreign currency covered call options.  In the manner of a pyramid scheme, the agreements also provided that PIC would pay an Area Broker a 10% override commission based on the gross commission of each person they personally recruited for PIC to act as an Area Broker.

The Corporate Defendants represented that they recruited 100 Area Brokers in 2004, the

majority recruited during the last quarter of 2004.  In February 2005, the Corporate Defendants represented that they had recruited over 140 Area Brokers.

The Corporate Defendants, acting in concert with Area Brokers, represented that they solicited customers to send them at least $80 million for the purpose of engaging in foreign currency covered call transactions.  In an effort to entice Area Brokers to solicit customers, the Corporate Defendants represented that Rogers personally handled a $30 million account to sell covered call transactions on foreign currency for Bill Gates, the Chairman of Microsoft.

The Corporate Defendants directed Area Brokers to instruct customers to send their funds to domestic and foreign bank accounts in the name of PIC, including, but not limited to, Chase Bank in Texas and New York, Bank One in Arizona, Asia-Europe-Americas Bank in Washington, Saxo Bank in Denmark, and Synthesis Bank in Switzerland.  Customer funds deposited into the domestic PIC bank accounts were immediately transferred to bank accounts controlled by Rogers in the name of Inforex.  The vast majority of funds in the Inforex accounts were then transferred to offshore bank accounts controlled by Rogers in the name of Inforex.

### iii.  Material Misrepresentations and Omissions Concerning Profit

In soliciting customers, the Corporate Defendants represented that they had an exclusive licensing agreement with a foreign bank whereby they were able to guarantee customers a monthly fixed income amounting to between 10% and 14.2 % in annual profits.  The Corporate Defendants guaranteed customers a 1.1 % monthly return which annualized to 13.2% on customer funds used to write a 10 year foreign currency covered call option.  The Corporate Defendants represented that, on the expiration date of a 10 year option, customers would receive

their deposit back and a sum representing "10% Value Added," equaling a total maturity of 14.2 %. The Corporate Defendants also guaranteed customers a 10 % annual return, representing a 0.83 % monthly return, on customer funds used to write a 5 year foreign currency covered call option.

The Corporate Defendants claimed that PIC would use customer funds to sell foreign currency covered calls and never place those funds at risk. The Corporate Defendants represented to customers that selling foreign currency covered calls is a "totally non-speculative and passive way to diversify your liquid assets for the dual purposes of creating a spendable, tax-free monthly cash flow and deferring taxes on capital gains until the year following the Expiration Date [of the option], whether it be a 5-Year or 10-Year Currency Call."

Contrary to their representations to customers, profits on covered call options strategies cannot be guaranteed. Profits cannot be guaranteed because the writing of covered calls on a foreign currency position exposes customer funds to the risk of partial or complete loss on the underlying currency as a result of changes in the currency exchange rates prior to the expiration date of the option.

   iv.  **Material Misrepresentations and Omissions**
       **Concerning Risk of Loss**

In addition to profit misrepresentations, the Corporate Defendants misrepresented the risk of loss associated with selling foreign currency covered call options by making material statements minimizing the risk of loss inherent in foreign currency options.

Through the PIC and PIB websites, and written representations to Area Brokers, the Corporate Defendants claimed that little or no risk was involved in selling covered currency

calls.  The Corporate Defendants represented that "Premium Income Corp will write and Sell Currency Calls for you, yet never place your deposit(s) at risk."

The Corporate Defendants' representations of no risk of loss to customers were materially false and they omitted to inform customers of material facts impacting risk of loss.  The Corporate Defendants failed to inform customers that writing covered calls on foreign currency has substantial downside risks.  Specifically, the Corporate Defendants failed to disclose to customers that the risk facing the foreign currency covered call writer is that the price of the currency will rise by an amount greater than the option premium received from the sale of the call option.

The Corporate Defendants misrepresented the significant risk of loss in writing covered calls on foreign currency by falsely stating that there was no risk of loss to customer funds because the risk is the same as the buying power of the dollar.  The Corporate Defendants failed to inform customers that writing covered calls has substantial downside risk that goes far beyond that of the buying power of the dollar.

     **v.**     **Material Misrepresentations and Omissions Concerning Expertise and Experience**

The Corporate Defendants made numerous misrepresentations and omissions of material fact in connection with their experience and expertise in foreign currency option transactions. The Corporate Defendants fraudulently misrepresented and failed to disclose -- particularly in light of affirmative and misleading representations they made on the same subjects -- significant facts about their background, trading ability, the nature of their professional trading experience, and the nature of their trading operations.

The Corporate Defendants represented that PIC had an exclusive license agreement with UBI. The Corporate Defendants stated that UBI was domiciled in Switzerland and was a wholly owned subsidiary of the "Churchill Bank Group serving in the United Kingdom with facilities in England, Denmark, Australia, Japan and elsewhere." Contrary to these representations, neither UBI nor the Churchill Bank Group is listed as a bank or authorized to do business in the United Kingdom, England or Australia. Further, the Corporate Defendants represented that UBI had a business address in Scotland that is, in fact, a residential apartment address unrelated to any business operations of UBI. The Corporate Defendants failed to disclose that UBI's website was registered to a business located in Scottsdale, Arizona, and was paid for by credit cards in the name of Rogers and Inforex.

The Corporate Defendants represented that PIC is a wholly owned subsidiary of Tri-Forex and that Tri-Forex is located in London, England with other locations in Sydney, Tokyo, and Seattle. The Corporate Defendants further represented that Tri-Forex specialized in writing international currency call options through its international network of currency exchange brokers, and had over 40 years experience. Contrary to these representations, Tri-Forex has no registered business address and is not authorized to do business in London, England, Sydney or Seattle.

The Corporate Defendants represented that "100% of your deposit is dedicated to 'Selling' $1,000 Covered Calls." Contrary to this representation, 10% of customer deposits were paid to Area Brokers in commissions that were not disclosed to the customers, thus immediately impairing the profit potential of their investments. Customer funds were also transferred to onshore and offshore bank accounts in the name of Inforex that were solely under Rogers'

control.

### vi.   Misappropriation of Customer Funds

The Corporate Defendants represented that all customer funds would be deposited into a "PIC Account" and used only for the purpose of selling covered calls on foreign currency. In fact, the Corporate Defendants misappropriated customer funds by using them to pay commissions to Area Brokers and pay expenses unrelated to foreign currency option transactions.

The Corporate Defendants directed at least some customers to make deposits in accounts in the name of PIC at Asia Europe Americas Bank ("AEA Bank"), J.P. Morgan Chase Bank ("Chase Bank"), and Bank One for the purpose of conducting foreign currency covered call transactions. The PIC account at Bank One was opened in January 2004, the PIC account at AEA Bank was opened in July 2004, and the two PIC accounts at Chase Bank were opened in November and December 2004. Between January 2004 and the filing of the Complaint herein, approximately $8.5 million was deposited into these PIC bank accounts.

The Corporate Defendants represented that customer funds would be deposited into individual PIC accounts and used exclusively for foreign currency covered call transactions. The Corporate Defendants further represented that customer funds would be transferred to a Swiss bank called UBI for the purpose of engaging in foreign currency covered call transactions. UBI is not registered as a Swiss bank and no funds were transferred from PIC bank accounts to UBI. Although customer funds were initially deposited in bank accounts in the name of PIC at Bank One, AEA Bank, and Chase Bank, the Corporate Defendants did not disclose to customers that their funds were immediately transferred from these PIC bank accounts to a domestic bank account in the name of Inforex at AEA Bank under the sole control of Rogers and then

transferred to offshore bank accounts in the name of Inforex at Saxo Bank in Denmark and Synthesis Bank in Switzerland.

The Corporate Defendants made monthly payments to some customers from the domestic Inforex bank account at AEA Bank and represented that those funds were derived from foreign currency option transactions taking place off-shore.  However, no funds from either offshore bank accounts or trading accounts representing putative trading profits, including the Inforex accounts at Saxo Bank and Synthesis Bank, were deposited in the Inforex domestic account at AEA Bank that the Corporate Defendants used to pay customers monthly payments.

The Corporate Defendants transferred most of the funds deposited into the PIC accounts at Bank One, AEA Bank and Chase Bank to an account in the name of Inforex at AEA Bank, an account under the sole control of Rogers.  The Corporate Defendants transferred approximately $370,000 of customer funds deposited in the Inforex account at AEA Bank to an account in the name of PIC at Global Cash Card ("Global").  Global is a company that provides prepaid ATM cash debit cards to its customers.  The Corporate Defendants issued Global debit cards to Area Brokers who used the cards to obtain commissions from the funds deposited by the Corporate Defendants with Global.

The Corporate Defendants transferred a portion of customer funds deposited in the Inforex account at AEA Bank to an account in the name of Inforex at Compass Bank under the sole control of Rogers.  Customer funds from this account were used to pay Roger's personal and business expenses.

The Corporate Defendants used a portion of customer funds deposited in the PIC account at Bank One to pay personal and business expenses.  The Corporate Defendants also used funds

from this account to pay broker commissions.

As set forth in the set forth in the Declaration of Kelly M. Crawford submitted in support of *Plaintiff's Motion for Summary Judgment against Defendant Gerald Leo Rogers,* during the period from April 2003 through March 2, 2005, when the Court granted the request of the CFTC for a statutory restraining order, no fewer than 161 customers deposited at least $11,891,608 in bank accounts in the name of PIC. During this period, $932,427 was paid to customers as purported "premiums." In addition, $1,147,776.69 was paid to brokers as commissions and overrides.

**E.     The Corporate Defendants Engaged In
         Illegal Off-Exchange Option Transactions**

The Corporate Defendants solicited persons to send them funds for the purpose of engaging in foreign currency covered call transactions. They represented to customers that PIC would write and sell foreign currency call options on behalf of customers.

The Corporate Defendants entered into account agreements between PIC and customers providing that customer accounts established with PIC "shall be for the writing (selling) of covered calls." The customer account agreements further provided that PIC would verify the foreign currency covered call transaction with the customer by a same-day confirmation, upon receipt of the customer's funds and executed account agreement.

The Corporate Defendants did not offer, sell, enter into, confirm the execution of, and/or conduct business of soliciting, accepting any order for or otherwise dealing in off-exchange foreign currency option transactions on or subject to the rules of a contract market or foreign board of trade, nor were any of these transactions executed or consummated by or through a

member of such a contract market or foreign board of trade.

Section 2(c)(2)(B)(i) and (ii) of the Act, 7 U.S.C. § 2, provides that the CFTC shall have jurisdiction over an agreement, contract or transaction in foreign currency that is an option, so long as the contract is "offered to, or entered into with, a person that is not an eligible contract participant" unless the counterparty, or the person offering to be the counterparty, is a specified regulated entity.

The Corporate Defendants offered and/or entered into foreign currency option transactions with individual customers, some or all of whom, on information and belief, were non-eligible contract participants, i.e., retail customers.

The Corporate Defendants deposited customer funds in domestic PIC accounts and transferred most of those funds to domestic and off-shore accounts in the name of Inforex under the sole control of Rogers. The Corporate Defendants issued monthly "profits" to customers from the Inforex accounts that were purportedly derived from covered call options transactions. By such conduct, the Corporate Defendants were acting as counterparties to the customers' options transactions. Neither the Corporate Defendants nor any of the other defendants was a proper counterparty for retail foreign currency option transactions as enumerated in Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2.

## IV.

## CONCLUSIONS OF LAW

Based on the failure of the PIC, Inforex, and Tri-Forex to answer or otherwise appear or plead in this action, the allegations in the Complaint as to PIC, Inforex, and Tri-Forex are deemed admitted.

From at least January 2004 and continuing through the present, PIC, Inforex, and Tri-Forex, either directly or through other persons or entities either under their employ, supervision and control or acting in combination or concert with them, violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Sections 1.1(b) and 32.9 of the Regulations, 17 C.F.R. §§ 1.1(b) and 32.9, in that they cheated, defrauded or deceived, or attempted to cheat, defraud, or deceive other persons by making false, deceptive, or misleading representations of material facts and by failing to disclose material facts, in soliciting customers or potential customers, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of commodity option transactions including, but not limited to:

(a)     false representations that customers who purchase options on foreign currency will be guaranteed profits of between 10% and 14.2%;

(b)     false representations that writing foreign currency covered call options involves little or no risk;

(c)     false representations that customer funds are being used to purchase and sell foreign currency options;

(d)     false representations that purported option transactions are generating significant profits;

(e)     failure to disclose the substantial risk associated with foreign currency options;

(f)     failure to disclose material facts regarding trading practices, commissions, and background of defendants, particularly in light of misleading affirmative statements made on those issues; and

(g)     misappropriation of customer funds.

Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Section 32.11 of the Regulations, 17 C.F.R. §§ 32.11, together provide that it shall be unlawful for any person to solicit or accept orders for, or accept funds in connection with, the purchase or sale of any commodity option, or

supervise any person or persons so engaged, unless the commodity option is conducted (1) on or subject to the rules of a contract market which has been designated by the CFTC to trade options and (2) by or through a member thereof in accordance with the Act and the CFTC Regulations.

From at least January 2004 to the present, PIC, Inforex, and Tri-Forex, and other persons or entities under their supervision or control, or acting in combination or concert with them, solicited and/or accepted orders for, and/or accepted money, securities or property in connection with, the purchase and sale of commodity options when such transactions were not conducted or executed on or subject to the rules of a contract market, or a foreign board of trade in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Section 32.11 of the Regulations, 17 C.F.R. § 32.11.

PIC, Inforex, and Tri-Forex each intentionally violated the provisions of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and CFTC Regulations 1.1(b), 32.9, and 32.11, 17 C.F.R. §§ 1.1(b), 32.9, 32.11, as alleged in the Complaint.

The CFTC is entitled to a final judgment permanently enjoining PIC, Inforex, and Tri-Forex from violating Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and CFTC Regulations 1.1(b), 32.9, and 32.11, 17 C.F.R. §§ 1.1(b), 32.9, 32.11.

The CFTC is entitled to a final judgment ordering that defendants PIC, Inforex and Tri-Forex are jointly and severally liable for payment of restitution to customers in the amount of $10,959,181, plus pre-judgment interest in the amount of $1,414,923, for a total of $12,374,104 plus post-judgment interest.  The restitution amount represents the losses customers incurred as a result of the violations of the Act and the CFTC Regulations alleged in the Complaint.

The CFTC is entitled to a final judgment ordering that defendants PIC, Inforex and Tri-

Forex are jointly and severally liable for payment of disgorgement in the amount of $10,959,181, plus pre-judgment interest in the amount of $1,414,923 for a total of $12,374,104. The amount of disgorgement represents the funds and benefits PIC, Inforex, and Tri-Forex obtained illegally as a result of the violations of the Act and the CFTC Regulations alleged in the Complaint.

The CFTC is entitled to a final judgment ordering that PIC, Inforex, and Tri-Forex shall each pay a civil monetary penalty in the amount of $37,122,312 pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1. The amount of the civil monetary penalty represents triple the monetary gain received as a result of the violations of the Act and the CFTC Regulations alleged in the Complaint.

## V.

## PERMANENT INJUNCTION

A.    **IT IS HEREBY ORDERED** that PIC, Inforex, and Tri-Forex are each permanently restrained, enjoined, and prohibited from directly or indirectly:

1.    Cheating, defrauding or deceiving, or attempting to cheat, defraud, or deceive other persons by making false, deceptive or misleading representations of material facts, by failing to disclose material facts, and by misappropriating customer funds in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of commodity option transactions in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and CFTC Regulations 1.1(b) and 32.9, 17 C.F.R. §§ 1.1(b), 32.9; and

2.    Soliciting or accepting orders for, or accepting funds in connection with, the purchase or sale of any commodity option, or supervising any person or persons so engaged, in violation of Section 4c(b) of the Act, 7 U.S.C. 6c(b), and CFTC Regulation 32.11, 17 C.F.R. § 32.11.

B.    **IT IS HEREBY FURTHER ORDERED** that PIC, Inforex, and Tri-Forex are each permanently restrained, enjoined, and prohibited from directly or indirectly engaging in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7

U.S.C. § 1a(4) ("commodity interest"), including, but not limited to, the following:

1. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2. Engaging in, controlling, or directing the trading of any futures or options accounts for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3. Soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest contract;

4. Placing orders or giving advice or price quotations, or other information in connection with the purchase or sale of commodity interest contracts for themselves and others;

5. Introducing customers to any other person engaged in the business of commodity interest trading;

6. Issuing statements or reports to others concerning commodity interest trading;

7. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

8. Engaging in any business activities related to commodity interest trading.

**D.    IT IS HEREBY FURTHER ORDERED** that the injunctive provisions of this Order shall be binding upon PIC, Inforex, and Tri-Forex, any person insofar as he or she is acting in the capacity of officer, agent, servant, or attorney of PIC, Inforex, or Tr-Forex, and any person who receives actual notice of this Order by personal service or otherwise insofar as he or she is acting in active concert or participation with PIC, Inforex, or Tri-Forex.

## VI.

## RESTITUTION, DISGORGEMENT, AND CIVIL MONETARY PENALTIES

**IT IS HEREBY ORDERED** that PIC, Inforex and Tri-Forex shall comply fully with the

following terms, conditions and obligations relating to the payment of restitution, disgorgement,

and civil monetary penalties.

## A.    RESTITUTION

1.     PIC, Inforex, and TriForex shall be jointly and severally liable to make restitution

in the amount of $10,959,181, plus pre-judgment interest in the amount of $1,414,923, for a total

of $12,374,104 plus post-judgment interest.  The restitution obligation of PIC, Inforex, and Tri-

Forex shall commence immediately on the entry of this Order.  The amount of restitution

represents the amount of funds that investors deposited into bank accounts in the name of PIC as

a result of the findings of fact set forth in this Order less the amount of funds paid to the investors

from those bank accounts.  The provisions of this Order shall in no way limit the ability of any

investor from seeking recovery from PIC, Inforex, Tri-Forex, or any other person or entity.

Further, nothing in this Order shall limit the ability of any investor from proving that a greater

amount is owed from PIC, Inforex, Tri-Forex, or any other person or entity, and nothing herein

shall be construed in any way to limit or abridge the rights of any investor that exist under state

or common law.  Pre-judgment interest was determined using the underpayment rate established

quarterly by the Internal Revenue Service pursuant to 26 U.S.C. § 6621(a)(2).  Post-judgment

interest shall be determined by using the Treasury Bill rate prevailing on the date of this Order

pursuant to 28 U.S.C. § 1961(a).

2.     Restitution payments under this Order shall be made to the Receiver appointed

herein, Kelly Crawford, by tendering payments to the Receiver at the following address: Sheef &
Stone, LLP, 5956 Sherry Lane, Dallas, Texas 75225.  The Receiver shall oversee the restitution
obligation of PIC, Inforex, and Tri-Forex and shall make periodic distributions of funds to
investors as appropriate.  Based upon the amount of funds available, the Receiver may defer
distribution until such time as it deems appropriate.  Restitution payments shall be made in an
equitable fashion as determined by the Receiver any person who demonstrates to the Receiver
that he or she is entitled to restitution under this Order.

3.      PIC, Inforex, and Tri-Forex shall notify the CFTC of any restitution payment with
a letter that identifies the name and docket number of this proceeding and the amount of the
payment, and shall transmit the letter and a copy of the form of payment to the Office of
Cooperative Enforcement, Division of Enforcement, CFTC, 1155 21st N.W., Washington, D.C.
20581.

**B.      DISGORGEMENT**

1.      PIC, Inforex, and Tri-Forex shall be jointly and severally liable to disgorge the
amount of $10,959,181, plus pre-judgment interest in the amount of $1,414,923, for a total of
$12,374,104 plus post-judgment interest.  PIC, Inforex, and Tri-Forex shall make disgorgement
immediately upon entry of this Order.  The amount of disgorgement represents the amount funds
that investors deposited into bank accounts in the name of PIC or Inforex as a result of the
findings of fact set forth in this Order less the amount of funds paid to the investors from those
bank accounts.

2.      PIC, Inforex, and Tri-Forex shall make disgorgement payments under this Order
to the Receiver in the same manner as they are required to make restitution payments.  PIC,

Inforex, and Tri-Forex shall notify the CFTC of any disgorgement payment with a letter that

identifies the name and docket number of this proceeding and the amount of the payment, and

shall transmit the letter and a copy of the form of payment to the Office of Cooperative

Enforcement, Division of Enforcement, CFTC, 1155 21st N.W., Washington, D.C. 20581.

     3.     The disgorgement amount for PIC, Inforex, and Tri-Forex will be reduced by the

amount of any payment made by them toward their restitution obligation herein.

## C.    CIVIL MONETARY PENALTY

     Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, PIC, Inforex, and Tri-Forex shall

each pay a civil monetary penalty in the amount of $37,122,312 plus post-judgment interest.  In

accordance with Section 6c of the Act, 7 U.S.C. § 13a-1, the amount of the civil monetary

penalty represents triple the monetary gain as measured by triple the amount of customer funds

received by PIC, Inforex, and Tri-Forex, less the funds returned to customers, plus pre-judgment

interest.  No funds shall be applied to the civil monetary penalty until PIC, Inforex, and TriForex

have fully satisfied their restitution and disgorgement obligations.  PIC, Inforex, and TriForex

shall each pay this penalty by making electronic funds transfer, U.S. postal money order, certified

check, bank cashier's check, or bank money order made payable to the CFTC and sent to the

following address:

         Commodity Futures Trading Commission
          Division of Enforcement
          ATTN: Marie Bateman - AMZ-300
          DOT/FAA/MMAC
          6500 S. Macarthur Blvd.
          Oklahoma City, OK 73169

PIC, Inforex, and TriForex shall accompany payment of the penalty with a cover letter to the

CFTC's Office of Cooperative Enforcement that identifies the name and docket number of this proceeding.  PIC, Inforex, and Tri-Forex shall simultaneously transmit a copy of the cover letter and the form of payment to the Director, Division of Enforcement, CFTC, 1155 21st N.W., Washington, D.C. 20581.

**D.      TRANSFER OF ASSETS**

PIC, Inforex, and Tri-Forex shall not transfer, or cause others to transfer, funds or other property to the custody, possession, or control of any other person or entity for the purpose of concealing such funds from this Court or the CFTC until their restitution, disgorgement, and civil monetary penalty obligations have been satisfied under this Order.

**D.      CONTINUATION OF ASSET FREEZE**

This Court's March 2, 2003 *Statutory Ex Parte Restraining Order Freezing Assets, Preserving Books and Records, Allowing Access To Books and Records, and Appointing Temporary Receiver, and Order Granting Expedited Discovery* shall remain in full force until the restitution, disgorgement, and civil monetary penalty obligations of PIC, Inforex, and Tri-Forex have been satisfied under this Order.  However, PIC, Inforex, and TriForex shall be permitted to transfer funds to the Receiver to satisfy their restitution and disgorgement obligations and to transfer funds to the CFTC to pay their civil monetary penalties.

**VII.**

**SCOPE OF ORDER**

**A.      IT IS HEREBY ORDERED** that this Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.  This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local

Rules of the United States District Court for the Northern District of Texas, and all provisions of the Act and CFTC Regulations relating or referring to the obligations hereunder.

**B.**     **IT IS HEREBY FURTHER ORDERED** that the following provisions shall apply to the terms and conditions of this Order:

1.     **Notices**:  All notices required by this Order shall be sent by certified mail, return receipt requested.

2.     **Waiver**:  The failure of any party to this Order or of any investor at any time to require performance of any provision of this Order shall in no manner affect the right of the party or investor to enforce the same or any other provision of this Order at a later time.  No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

3.     **Invalidation**:  If any provision, or the application of any provision of this Order, is held invalid, the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

5.     **Integration**:  Nothing shall serve to amend or modify this Order in any respect, unless:  (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by order of this Court.

**Done and Ordered this** _25_ **day of** _Jan_ _2007, **at Dallas, Texas.**_

_____
**JANE J. BOYLE**
**UNITED STATES DISTRICT JUDGE**